**EXHIBIT A**

State of Illinois            )
                             ) ss
County of St. Clair          )

**UNSWORN DECLARATION UNDER PENALTY OF PERJURY
IN SUPPORT OF COMPLAINT FOR FORFEITURE**

I, Lucas Ward, declare under penalty of perjury the following:

At all relevant times, I have been a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA). The contents of this Declaration are based on information provided to me during the course of my investigation from participants in the criminal activity, from other witnesses, and from other law enforcement officers.

1. On January 6, 2023, at 3:07 p.m. declarant and DEA Task Force Officer Larry Brantley (TFO Brantley) conducted a traffic stop on a gray Hyundai Kona SUV for speeding. Officers paced the vehicle at 70 MPH in a 65 MPH zone. The traffic violation occurred on Interstate 270 west bound around the 13 mile marker in Madison County, Illinois. Declarant approached the vehicle on the passenger side and made contact with the driver and sole occupant of the vehicle. Declarant informed the driver the reason for the traffic stop and requested her driver's license. The driver provided a California driver's license identifying her as Elvia SANTANA. The vehicle returned to Hertz Vehicle, LLC.

2. Declarant informed the driver that she would not be receiving a traffic citation but would be issued a verbal warning for the traffic violation. SANTANA stated that her GPS showed both 65 MPH and 70 MPH. Declarant explained that the speed limit dropped to 65 MPH. SANTANA then stated that she was "trying to stick with the traffic."

3. While SANTANA was retrieving her driver's license, declarant asked SANTANA where she was headed and SANTANA stated "Kansas City." Declarant then asked SANTANA where she was from and she stated "California." Declarant asked why SANTANA was headed to Kansas

City. SANTANA explained that she planned to "catch a bus and go to Mexico and then after that [she was] going back home." Declarant asked SANTANA where she was traveling from today and SANTANA stated "Indiana, well Indianapolis." Declarant asked SANTANA why she was in Indianapolis and she stated "visiting family." Declarant asked SANTANA when she went to Indiana and SANTANA stated "about three days ago." Declarant asked SANTANA if she flew to Indiana and SANTANA stated "part of it, but part of it not." Declarant asked SANTANA where she flew to, and SANTANA changed her story and stated "yeah I flew there." Declarant clarified asking SANTANA if she flew to Indiana from California. SANTANA responded "yes." Declarant asked SANTANA when she flew to Indiana and SANTANA stated "two days ago."

4. Declarant asked SANTANA for the rental agreement for the vehicle. Declarant then asked SANTANA if she visited with friends or family in Indiana, but her response was inaudible. Declarant asked SANTANA again where she was driving to and she stated "Kansas City." Declarant asked if that was where she was catching a bus and if the vehicle was being returned in Kansas City. SANTANA stated "no, no, no. I am trying to see if I can get to L.A., I need to see someone in L.A." Declarant asked SANTANA when she was getting on the bus and she responded "um, probably tomorrow." Declarant asked SANTANA again where she was getting on the bus and SANTANA stated "in Kansas City." Again, trying to clarify, declarant asked SANTANA if she was getting on a bus to L.A. Declarant thought SANTANA stated something about trying to find a bus to L.A. or, in the alternative, extending the vehicle rental. Declarant asked SANTANA who she was going to see in Kansas City and SANTANA stated "I do tax returns so I am going to see if I can find a spot to open a office in Kansas City."

5. Declarant returned to the patrol vehicle and spoke with TFO Brantley. TFO Brantley advised declarant that SANTANA had a criminal history involving Alien Smuggling. Officers noticed

2

that the vehicle rental agreement stated that SANTANA rented the vehicle in Chicago the day before (January 5, 2023) and that the vehicle was supposed to have been returned that afternoon (January 6, 2023) at 2 p.m. in Kansas City. A review of License Plate Reader (LPR) data showed multiple sightings of SANTANA's vehicle in Chicago on January 5, 2023, which contradicted SANTANA's story of being in Indianapolis the last two or three days. Officers also noted that SANTANA traveled from a source city for narcotics and that her destination was also a source city for narcotics. Declarant believed SANTANA had an implausible story as she would change her story in ways that seemed deceptive to declarant, such as changing when she arrived in Indiana, whether she flew to Indiana, and where she was traveling to next. Due to these factors, along with SANTANAs nervousness and shallow breathing, officers determined that SANTANA could be involved in criminal activity.

6. While TFO Brantley completed the traffic warning, declarant reapproached SANTANA's vehicle and handed back her driver's license and rental agreement. Declarant asked SANTANA if she had anything illegal in the vehicle and SANTANA stated "no." Declarant asked if SANTANA had any marihuana, cocaine, heroin, fentanyl, or methamphetamine and SANTANA responded "no" to each of these. Declarant then asked SANTANA if she had any sums of currency over $10,000 and SANTANA responded "no." Declarant asked if she was sure as SANTANA had a ghost-like look to her face and was hesitant to answer the question. Declarant asked SANTANA for permission to search the vehicle and SANTANA asked "why do you want to, can't you get a warrant or something?" Declarant explained that the officers had enough reasonable suspicion to detain her and the vehicle while they call for a K9. Declarant asked SANTANA if she preferred that they call for a K9. SANTANA stated "I do have money, but it's not illegal money." Declarant asked if the currency was over $10,000 and SANTANA stated "yes." Declarant asked how much money SANTANA had and she stated "about 117,000 dollars." Declarant asked SANTANA again if officers

3

could search her vehicle and SANTANA consented.

7. Declarant asked SANTANA to step out of the vehicle. Declarant asked SANTANA where the money was located in the vehicle and SANTANA stated it was in her suitcase. Declarant removed the suitcase from the vehicle and placed it on the ground. As declarant was searching the suitcase, SANTANA stated "it is all along on the side." Declarant located several rubber-banded bundles of United States currency in the liner of the suitcase. The bundles consisted of several smaller rubber-banded bundles that were placed inside of a "no show" style women's sock. Officers also located additional socks that appeared to be recently purchased and missing some of the pairs. Additional currency was also located inside of a sweatshirt inside of the suitcase as well as inside of a pink purse.

8. TFO Brantley then read SANTANA her Miranda Rights. SANTANA asked "why am I being detained, because the cash money is mine?" TFO Brantley asked SANTANA if he could ask her some questions about the currency and SANTANA stated "can I wait until I have an attorney because I do not want to be incriminated, I buy and sell gold." TFO Brantley explained that if they could not ask questions about the currency and determine why SANTANA had it, then the currency would be seized. SANTANA stated "it is my money, I just want someone present during the interrogation." SANTANA further stated "I have been taking it out of my bank account little by little." TFO Brantley asked SANTANA if she had proof of the bank withdrawals and she stated "not right now, that is why I want to contact an attorney." SANTANA then stated "you can seize it I'd rather talk to an attorney because I don't think this is right, because we can have money. I have carried money a long time to buy and sell gold all the time. I just didn't bring my license for a few years for my second-hand dealers license." TFO Brantley asked SANTANA if she was a dealer of gold. SANTANA stated "well I buy gold and I used to have a second-hand dealers license. I just didn't bring it with me

because I didn't go the flea markets anymore. I just started doing it with private parties it is my money I just keep it because I just keep it." TFO Brantley asked SANTANA if she was saying that she was buying and selling gold. SANTANA stated "well not right now no." TFO Brantley asked if SANTANA just carries the money with her. SANTANA stated "I had it with me because I wanted to see if I was going to be opening up another business in these areas." SANTANA further stated "I didn't have anywhere to put it to be honest. When I put it in the bank I have had levy so I have been trying not to put everything in the bank." TFO Brantley asked if SANTANA was avoiding paying taxes. SANTANA stated "no not to avoid taxes because I have to pay taxes. Just to avoid the levy's, because sometimes I will put money in and they will take the money from me, and say that I still owe money from other issues."

9. The currency was photographed in its original location and then transferred to a Self-Sealing Evidence Bag. The bag was sealed in front of SANTANA and she signed the bag claiming ownership.

10. Due to officer safety, the vehicle and parties relocated to the DEA Resident Office (FHRO) in Fairview Heights, Illinois. Once at the FHRO, a more thorough search of the vehicle was conducted.

11. During this search several airplane tickets, receipts, and a parking pass were located, including multiple bank deposit receipts. The bank deposit receipts included:

    a. A January 15, 2021, Bank of America counter deposit into account ending in 4848 in the name of Jose A. Gonzalez in the amount of $1,000;

    b. A July 18, 2022, Bank of America counter deposit into account ending in 4922 in the name of Veronica Alvidrez in the amount of $1,600;

    c. An August 2, 2022, Bank of America counter deposit into account ending in 2809 in the name of Jose Luis Martinez in the amount of $3,500;

    d. A November 10, 2022, Bank of America counter deposit into account ending in

0507 in the name of Roman Alberto Alvidrez in the amount of $3,000;

e. A November 29, 2022, Bank of America ATM cash deposit into account ending in 5427 totaling $6,940.00 at Josey and Valley View Farmers Branch in Texas;

f. A December 19, 2022, Bank of America counter deposit into account ending in 2809 in the name of Jose Luis Martinez in the amount of $1,000; and

g. A January 4, 2023, Bank of America ATM cash deposit into account ending in 6914 totaling $1,000.00 in Modesto, California.

12. Agents also located a Southwest Airlines boarding pass in the name of Elvia SANTANA for Flight 1230 flying from SMF (Sacramento, California) to MDW (Chicago, IL) on January 5, 2023. According to the boarding pass, Flight 1230 was scheduled to depart SMF at approximately 5:45 a.m. on January 5, 2023, and arrive at MDW at approximately 10:05 a.m.

13. According to the vehicle rental agreement provided by SANTANA, she rented the Hyundai Kona SUV at 2:28 p.m. on January 5, 2023, from Hertz at the Chicago Midway Airport and planned to return the vehicle at the Kansas City International Airport at 2:00 p.m. the following day (January 6, 2023).

14. According to License Plate Reader (LPR) sightings, SANTANA's rental vehicle was last seen South bound on Interstate 94 at 11:15 p.m. on January 5, 2023.

15. According to a receipt located in SANTANA's vehicle, she stopped at a Cracker Barrel restaurant in Fishers, Indiana at 11:27 a.m. (EDT) on January 6, 2023. SANTANA was stopped by declarant and TFO Brantely at approximately 3:07 p.m. (CST).

16. Special Agent Winfred Strickland (SA Strickland) and TFO Jake Degener (TFO Degener) attempted to interview SANTANA. SANTANA was advised of her Miranda Rights by SA Strickland. SANTANA stated that she wanted a lawyer. SANTANA then stated "the money is my money. I owe the money to people, I have the contracts, that they signed and I signed and I pay them interest every month." SANTANA also gave agents consent to search her cell phone. After

6

completing the arrest process, SANTANA was released.

17. On January 10, 2023, TFO Moravec and his K9 partner, Tobi, conducted an open-air sniff of the currency seized from SANTANA's vehicle. TFO Moravec informed declarant that K9 Tobi gave a positive alert for the odor of narcotics on the seized currency.

18. During the course of the investigation, agents learned that SANTANA was frequenting the Century Casino Central City located in Central City, Colorado. On January 10, 2023, agents received information from Century Casino Central City Colorado. The information was regarding SANTANA's activities during her time at the casino.

19. Representatives with the Casino stated that SANTANA would bring a large amount of twenty-dollar bills to exchange for one-hundred-dollar bills. In one instance, SANTANA exchanged a total of $9,760.

20. SANTANA is also observed putting multiple twenty-dollar bills into a number of machines and then a short time later withdrawing from the slot machine. SANTANA would lose/win very little when she "gambled."

21. On August 4, 2022, representatives from the Casino reported seeing SANTANA with an unidentified male (UM) inside of the Casino as well as in the parking area. Per the report, the UM makes contact with SANTANA while SANTANA is playing at a machine. SANTANA is seen opening her purse and handing the UM a stack of bills. A couple of minutes later SANTANA is seen handing the UM more bills from her purse and the UM is seen putting the bills in the left front pocket of his jeans. After playing a little while longer, SANTANA approaches Cage Window #1 and cashes in. The UM arrives at Cage Window #1 and SANTANA is seen handing him an unknown amount of bills.

22. At approximately 6:40 p.m., SANTANA and the UM are seen leaving the Casino floor and entering the Citi Grill where they sit down and eat. After eating, SANTANA and the UM are seen leaving the Casino through the sky-bridge to the parking garage. The UM exits to garage level 3, leaves in a red Jeep, and then parks in garage level 1 across from SANTANA's vehicle. The UM exits his vehicle and enters the passenger side of SANTANA's vehicle. SANTANA exits the level 1 garage lobby and enters garage level 1. SANTANA opens the trunk and removes luggage. SANTANA closes the trunk and re-enters her vehicle. The UM exits the vehicle with a black bag, opens the trunk and puts the bag in. The UM closes the trunk and walks over to the passenger side of SANTANA's vehicle and makes contact with SANTANA. The UM transfers a white plastic bag to the trunk and closes the trunk. The UM gets back into the passenger side of SANTANA's vehicle and they exit at garage level 3.

23. Agents also received information from Southwest Airlines. According to SANTANA's flight history, SANTANA was originally booked on a flight from El Paso, Texas to Denver on January 8, 2023. This flight was changed, and SANTANA flew from Kansas City to Denver on January 7, 2023. Neither of these flights are consistent with the story SANTANA told declarant.

24. The seized United States currency was transferred to Loomis and an official count of the currency was conducted. The amount totaled $117,000.00.

25. Based on the foregoing, declarant believes that the $117,000.00 in United States Currency is property which constitutes money furnished or intended to be furnished by a person in exchange for a controlled substance, or proceeds traceable to such an exchange, or money used to facilitate a violation of 21 U.S.C. Section 801 *et seq*.

Pursuant to 28 U.S.C. Section 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ____ day of June, 2023.

_____
TFO S. ____
LUCAS WARD
Task Force Officer
Drug Enforcement Administration